[Oral Argument on Emergency Motion to Stay held October 20, 2017]

## No. 17-5236
_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

ROCHELLE GARZA, as guardian ad litem to unaccompanied minor J.D.,

Plaintiff-Appellee,

v.

ERIC HARGAN, Acting Secretary of Health and Human Services, *et al.,*

Defendants-Appellants.
_____

Appeal from the United States District Court for the District of Columbia
(No. 17-cv-02122-TSC)
_____

## EMERGENCY PETITION FOR REHEARING EN BANC TO VACATE THE PANEL'S ORDER AND DENY DEFENDANTS-APPELLANTS' MOTION FOR AN EMERGENCY STAY

Brigitte Amiri
Meagan Burrows
Jennifer Dalven
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel. 212-549-2633
bamiri@aclu.org
mburrows@aclu.org
jdalven@aclu.org

Arthur B. Spitzer
Scott Michelman
AMERICAN CIVIL LIBERTIES UNION
    OF THE DISTRICT OF COLUMBIA
4301 Connecticut Avenue NW, Suite 434
Washington, D.C. 20008
Tel. 202-457-0800
smichelman@acludc.org
aspitzer@acludc.org

*Attorneys for Plaintiff-Appellee*
*[Additional counsel listed below]*

October 22, 2017

**CERTIFICATE AS TO PARTIES, AMICI AND RULING UNDER REVIEW**

Pursuant to this Court's Circuit Rule 28(a)(1)(A), the undersigned counsel hereby certifies as follows:

Plaintiff-Appellee is Rochelle Garza, the court-appointed guardian ad litem for J.D., a pregnant unaccompanied minor in the legal custody of the federal government, suing on her own behalf and as the class representative of other similarly situated young women.

The defendants are Eric Hargan, the Acting Secretary of HHS (sued in his official capacity); Steven Wagner, the Acting Assistant Secretary for the Administration for Children and Families (sued in his official and personal capacities); and Scott Lloyd, the Director of the Office of Refugee Resettlement (sued in his official and personal capacities). Only the three official capacity defendants are appellants on this appeal.

No party intervened in the District Court.

The States of Texas, Arkansas, Louisiana, Michigan, Missouri, Nebraska, Ohio, Oklahoma, and South Carolina have sought leave to participate as *amici*.

The ruling under review in this case is the October 20, 2017 Per Curiam Order entered after oral argument by a majority of a Circuit panel consisting of Circuit Judges Henderson, Kavanaugh, and Millett, which dissolved the administrative stay and vacated the District Court's temporary restraining order

entered on October 18, 2017, directing the District Court to allow the Appellants until Tuesday, October 31, 2017, at 5:00 p.m. Eastern Time to secure a sponsor for J.D. and for J.D. to be released to a sponsor. The Order further instructs that, should a sponsor not be secured and J.D. not be released to the sponsor by that time, the District Court may re-enter a temporary restraining order, preliminary injunction, or other appropriate order, and the Government or J.D. may, if they choose, immediately appeal. The District Court's order is reported at 2017 WL 4707287.

Date: October 22, 2017

/s Arthur B. Spitzer
Arthur B. Spitzer

*Attorney for Plaintiff-Appellee*

# TABLE OF CONTENTS

**CERTIFICATE AS TO PARTIES, AMICI AND RULING UNDER REVIEW** ........................................................................ ii

**TABLE OF AUTHORITIES** ............................................................. v

**BACKGROUND** ......................................................................... 2

**ARGUMENT** ............................................................................ 6

   I. **THE PANEL'S OPINION CONFLICTS WITH WELL-SETTLED SUPREME COURT PRECEDENT** ......................................... 6

   II. **THIS CASE RAISES QUESTIONS OF EXCEPTIONAL IMPORTANCE** ...................................................................... 12

**CONCLUSION** .......................................................................... 13

**CERTIFICATE OF COMPLIANCE** ............................................... 16

**CERTIFICATE OF SERVICE** ...................................................... 17

**COPY OF PANEL OPINION** ............................................... Appendix

**COPY OF MILLETT, J. DISSENT** ........................................ Appendix

**DECLARATION OF ROBERT CAREY** ................................. Appendix

# TABLE OF AUTHORITIES

**Cases**

*Cleveland Board of Education v. LaFleur*, 414 U.S. 632 (1974) ............................11

*Cooper v. Aaron*, 358 U.S. 1 (1958) .........................................................13

D.C. Court of Appeals v. Feldman, 460 U.S. 462 (1983) .........................................3

*Garza v. Hargan*, No. 17-CV-02122 (TSC), 2017 WL 4707287 (D.D.C. Oct 18, 2017) ..................................................................................3, 10

*Harris v. McRae*, 448 U.S. 297 (1979) .....................................................10

*Maher v. Roe*, 432 U.S. 464 (1977) ........................................................10

*Missouri ex rel Gaines v. Canada*, 305 U.S. 337 (1938)......................................12

*Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326 (3d Cir. 1987)........7

*Planned Parenthood of Southeast Pennsylvania v. Casey*, 505 U.S. 833 (1992) .....1

*Planned Parenthood v. Casey*, 505 U.S. 833 (1992)..........................................6, 13

*Roe v. Crawford*, 514 F.3d 789 (8th Cir. 2008).............................................7

*Roe v. Wade*, 410 U.S. 113 (1973)................................................... 1, 6, 13

*Shapiro v. Thompson*, 394 U.S. 618 (1969)..................................................11

*Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016)...................... 1, 6, 8

**Statutes**

6 U.S.C. § 279 ............................................................................4, 8

8 U.S.C. § 1101(a)(27)(J) ..................................................................12

8 U.S.C. § 1232 ..........................................................................4, 8

8 U.S.C. § 1255(a) ................................................................................12

**Other Authorities**

ICE Guidelines, Detention Standard 4.4, Medical Care (if an ICE detainee requests abortion, ICE "shall arrange for transportation at no cost" to the detainee), 307, *available at* https://www.ice.gov/doclib/detention-standards/2011/medical_care_women.pdf ........................................................10

Linda A. Bartlett et al., *Risk Factors For Legal Induced Abortion-Related Mortality In the United States*, 103:4 Obstetrics & Gynecology 729 (Apr. 2004) 5

Texas Family Code § 33.003(i)(1)-(2) ......................................................2

**Rules**

Federal Rules of Appellate Procedure 35(b) ..............................................1

Federal Rules of Appellate Procedure 35(b)(1)(A) ...................................1

Federal Rules of Appellate Procedure 35(b)(1)(B) ...................................1

**Regulations**

28 C.F.R. § 551.23 ................................................................................11

8 C.F.R. § 204.11 ................................................................................13

## <u>RULE 35 STATEMENT</u>

Pursuant to Fed. R. App. P. 35(b), Appellee Garza hereby seeks emergency en banc rehearing of the panel's Order of October 20, 2017, which vacated paragraphs 1 and 2 of the district court's October 18, 2017 temporary restraining order. That order prohibited the federal government from blocking J.D., an unaccompanied immigrant minor in a government-funded shelter in Texas, from having an abortion. "[T]he panel decision conflicts with a decision of the United States Supreme Court," Fed. R. App. P. 35(b)(1)(A), and "the proceeding involves one or more questions of exceptional importance." Fed. R. App. P. 35(b)(1)(B). As discussed below, and in Judge Millett's dissent from the panel's order, the panel's ruling "defies controlling Supreme Court precedent." *Garza v. Hargan*, No. 17-5236, Doc. 1700712, at 2 (D.C. Cir. Oct. 20, 2017) (Millett, J., dissenting) ("Millett Dissent"). Specifically, the panel majority's decision allowing the federal government to continue to block J.D. from accessing abortion violates decades of well-settled Supreme Court precedent that holds that the government may not impose an undue burden on—or, as in this extraordinary case, completely block—a woman's ability to obtain an abortion. *See, e.g.*, *Roe v. Wade*, 410 U.S. 113 (1973); *Planned Parenthood of Southeast Pennsylvania v. Casey*, 505 U.S. 833 (1992); *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016). Moreover, this case involves a question of exceptional importance, namely, whether the

government may "sacrifice[] J.D.'s constitutional liberty, autonomy, and personal dignity for no justifiable governmental reason." Millett Dissent at 2.

While this litigation proceeds, a seventeen-year-old pregnant woman waits to hear whether she will be able to have the abortion she desires or whether instead the government will be allowed to force her to continue the pregnancy and have a baby against her will. Our government has held her in this unlawful position for almost a month; this Court should not allow this injustice to continue any longer. For these reasons, Plaintiff requests that this Court swiftly grant rehearing en banc, vacate the panel's order and deny Defendants' motion for a stay pending appeal.

## BACKGROUND

J.D. is a seventeen-year-old, unaccompanied immigrant minor who is currently in the federal government's legal custody, and lives in a government-funded shelter in South Texas run by a private contractor. She is approximately 15-½ weeks pregnant, and she strongly desires an abortion. Four weeks ago, with the assistance of court-appointed guardian and attorney ad litems, a Texas state court ruled that J.D. was either "mature and sufficiently informed to make the decision to have an abortion" and/or that "notification and attempt to obtain consent would not be in [her] best interest," Texas Family Code § 33.003(i)(1)-(2), and granted her legal authority to consent to the procedure. That state-law determination is not subject to collateral review here. *See D.C. Court of Appeals v.*

*Feldman,* 460 U.S. 462, 476 (1983). Since that time, however, the federal government has refused to allow anyone to transport J.D. to the health care center that provides abortion. This is so despite the fact that J.D. is not seeking any assistance from Defendants to obtain the abortion: Her court-appointed representatives or the shelter personnel stand ready to transport her; the health center stands ready to provide the care; and private funds have been provided to pay for the procedure. All Defendants must do is to step aside and stop blocking the door.

The district court and Judge Millett both concluded that the government's actions are blatantly unconstitutional, violating forty years of Supreme Court precedent. *Garza v. Hargan*, No. 17-CV-02122 (TSC), 2017 WL 4707287, at *1 (D.D.C. Oct. 18, 2017)("Chutkan Order"); Millett Dissent at 2-3, 5. The panel's order does not confront the constitutional issues in any meaningful way. Instead it allows the government to continue to deny J.D.'s constitutional rights while Defendants may attempt to identify, investigate, approve, and release J.D. to a sponsor.[1] The panel majority's order does so notwithstanding the fact that Defendants have been under a statutory obligation to attempt to identify such a

_____

[1] Given that Defendants' stated goal is to "promot[e] childbirth," Appellants' Reply in Support of Their Emergency Motion for Stay Pending Appeal, Doc. 1700424, at 1, the extent of their willingness to urgently locate, approve, and release J.D. to a sponsor who will allow her to obtain an abortion may fairly be questioned.

sponsor for more than six weeks. 8 U.S.C. § 1232; 6 U.S.C. § 279; Declaration of Christine Cortez ("Cortez Decl") ¶ 6 (filed under seal in *Garza v. Hargan*, No. 17-CV-02122 (TSC)(D.D.C.); Millett Dissent at 7. And they have rejected both of the potential sponsors identified by J.D.'s family. Oral Arg. at 5:04; 1:18:30, *Garza v. Hargan*, No. 17-5236, (D.C. Cir. Oct. 20, 2017), before Henderson, J., Kavanaugh, J., Millett., J, https://www.cadc.uscourts.gov/recordings/recordings.nsf/ (hereinafter "Oral Arg."); Cortez Decl. ¶ 7. Moreover, at argument before the panel, Defendants could not point to any additional names that they are currently considering. Oral Arg. at 4:30; 1:19:25.

Nor does the panel's order allow J.D. to obtain her abortion if efforts to identify a sponsor are unsuccessful. Rather, under the order, at that point—on October 31 at 5:00 p.m., almost five weeks after her original appointment for an abortion—J.D. must return to district court and start the process again, with appeals to follow. *Garza v. Hargan*, No. 17-5236, Doc. 1700704, (D.C. Cir. Oct. 20, 2017) ("Panel Order"); Millett Dissent at 6 (noting that "[t]he court orders J.D. to continue her pregnancy for weeks"). All the while, this young, isolated woman remains pregnant against her will, causing her irreparable harm. The government has already delayed J.D.'s abortion for almost four weeks. The panel's order permits the government to, at minimum, delay her for two more. Every additional day she must remain pregnant against her will places a severe strain on J.D., both

physically and emotionally. Every additional week the government delays her abortion increases the risks associated with the procedure. *See, e.g.,* Linda A. Bartlett et al., *Risk Factors For Legal Induced Abortion-Related Mortality In the United States*, 103:4 Obstetrics & Gynecology 729 (Apr. 2004) (relative risk of abortion increases *38% per gestational week*). Very soon she will no longer be able to get an abortion in South Texas. In a matter of weeks, J.D. will no longer be able to get an abortion at all, and the government will have forced J.D. to have a child against her will.

Based on the discussion at oral argument, it appears that the panel majority is subjecting J.D. to these additional risks and additional weeks of unwanted pregnancy based on its speculative hope that J.D. can be released to a sponsor quickly enough to enable the Court to avoid deciding this controversy. While delay in the hope of non-judicial resolution may be a sensible course in an appropriate case, it is not proper in this case, which involves the ongoing and irreparable violation of J.D.'s well-settled constitutional rights. Moreover as the declaration filed by Robert Carey, former Director of the Office of Refugee Resettlement makes plain, the notion that an appropriate sponsor for J.D. could be identified, properly vetted, and approved in an eleven day time frame is entirely unrealistic. *See* Declaration of Robert Carey ("Carey Decl.") ¶¶ 5, 28 (filed in *Garza v. Hargan*, No. 17-CV-02122 (TSC) (D.D.C.), attached hereto. The panel's

desire to avoid ruling on the merits does not outweigh J.D.'s right to terminate her pregnancy.

## ARGUMENT

## I. THE PANEL'S OPINION CONFLICTS WITH WELL-SETTLED SUPREME COURT PRECEDENT

The panel's order directly conflicts with the central holding of *Roe v. Wade* 410 U.S. 113 (1973), as reaffirmed in *Planned Parenthood v. Casey*, 505 U.S. 833 (1992) and most recently in *Whole Woman's Health v. Hellerstedt* 136 S. Ct. 2292 (2016). As *Roe* and its progeny make clear, the government may not erect a ban on a woman's abortion or place a substantial obstacle her path. Nevertheless, the panel's order enables the government to continue to *physically* block J.D.'s access to abortion, which is the ultimate "undue burden" prohibited by clear Supreme Court precedent. As Judge Millett's statement in dissent thoroughly explains, none of the reasons the government offers for "taking over J.D.'s decision completely and forcing her to continue an unwanted pregnancy" "remotely qualifies under the Constitution, . . . or even makes sense." Millett Dissent at 4. Further discussion of the facts and the law can be found in Plaintiff's brief filed in opposition to Appellants' motion for a stay on October 19, 2017, Doc. 1700237, but Plaintiff makes five brief points here:

*First*, as a threshold matter, the panel majority's order notes, "the Government has assumed, for purposes of this case, that J.D. . . . possesses a

constitutional right to obtain an abortion in the United States." Panel Order at 2.

Indeed, as Judge Millett noted, "[t]he United States government, understandably, has deliberately and knowingly decided *not* to raise" an argument that J.D. lacks the constitutional right to have an abortion based on her immigration status. It is both forfeited and waived." Millett Dissent at 8. Thus, J.D.'s immigration status has no bearing on her constitutional claims. If Defendants are allowed to block J.D.'s abortion access, they could do the same to citizens in government custody—a position that has already been rejected. *See, e.g.*, *Roe v. Crawford*, 514 F.3d 789 (8th Cir. 2008); *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 334 n.11 (3d Cir. 1987).

*Second*, as noted above, the majority's order delays J.D.'s abortion for eleven days to give the government time to find J.D. an immigration sponsor. At the expiration of that time, J.D. will not be allowed to access abortion. Rather, J.D. is back at square one. She must go back to the district court seeking a new order requiring the government to release her to get the abortion. Even assuming that an order from the district court could be obtained quickly, the panel order expressly contemplates appeals, which Defendants most certainly will take. In other words, in approximately two weeks, the parties will be right back before this Court, and J.D.'s abortion will have been delayed for at least six weeks because of Defendants' actions, coupled with the panel's order that enables Defendants'

unconstitutional acts.  Had Defendants complied with their constitutional obligations, J.D. would have obtained an abortion in the first-trimester of her pregnancy in September.  Under the panel's order, she will be pushed into November, pushing her closer to the point at which abortion is barred under Texas law.  The Supreme Court has never countenanced government action that forces a woman to delay her abortion for anywhere approaching this length of time.  *See Whole Woman's Health*, 136 S. Ct. at 2318 (striking down abortion restriction that resulted in three week wait time for appointments).

*Third*, the panel's eleven-day additional delay is extremely likely to be an exercise in futility that serves no purpose other than to keep J.D. pregnant longer. The government has been under a statutory obligation to attempt to find an appropriate sponsor for more than six weeks and thus far none has been found.  8 U.S.C. § 1232; 6 U.S.C. § 279; Millett Dissent at 7.  Two potential sponsors were identified for J.D., but neither was approved.  Cortez Decl. ¶ 6; Millett Dissent at 7; Oral Arg. at 5:04; 1:18:30.  And at argument before the panel, the government did not assert that any additional potential sponsors are under consideration at this time.  Oral Arg. at 4:30; 1:19:25.  Moreover, it is wishful thinking to suggest that a sponsor will come to light and be approved within the Court's eleven-day time frame.  As an initial matter, as detailed in the Declaration of Robert Carey, former Director of (ORR), "ORR does not allow individuals without a prior relationship to

the minor and/or the minor's family to act as a sponsor. In fact, ORR requires sponsors to provide documentary evidence of a prior relationship with the minor and/or the minor's family in order to be approved." Carey Decl. ¶ 15; *see also id.* ¶ 13 (explaining that the government does not maintain a list of individuals who stand ready to serve as sponsors for unaccompanied immigrant minors). This policy is "designed to keep minors safe from abuse and from trafficking and exploitation." *Id.* ¶ 14. Moreover, as detailed in former-Director Carey's declaration, even if an eligible potential willing sponsor were suddenly identified for J.D., the process of vetting and approving a sponsor is necessarily extensive and takes significant time, at minimum several weeks or months, not days. *Id.* ¶ 28.

*Fourth,* Defendants' argument that their actions are permissible because they are simply choosing not to "facilitate" J.D.'s abortion is belied by both the facts and the law. As Judge Millett recognized, "there is nothing for [the government] to facilitate" in J.D.'s case. Millett Dissent at 4. J.D.'s court-appointed guardian and representative stand ready to take her to the health center; the health center is ready to see her; and private funds would pay for the abortion. All the government has to do is to allow J.D. to leave the facility with her court-appointed

representatives or allow the shelter to transport her.[2]  The government's actions

are not a refusal to facilitate; they are physical obstruction.[3]  Moreover, as Judge

Millett pointed out, "the government's insistence that it must not even stand back

and permit an abortion to go forward for someone in some form of custody is

freakishly erratic," as the government affirmatively facilitates the process for

women (just a few months older than J.D.) in ICE detention and in the custody of

the Bureau of Prisons.[4]  Millett Dissent at 5.

     Defendants rely on cases permitting the government to cover services related

to childbirth, but not abortion, in the Medicaid program, *see Maher v. Roe*, 432

U.S. 464, 475 (1977);  *Harris v. McRae*, 448 U.S. 297, 314 (1980), but these cases

demonstrate how far out of bounds the government's position is.  The *Maher* Court

stressed that its holding "signals no retreat from *Roe*" and distinguished between

---

[2] While Defendants have a legal obligation to transport unaccompanied immigrant minors seeking abortions to their appointments, the Temporary Restraining Order does not even require them to do so.  Rather, it permits Defendants to allow J.D.'s guardian or attorney ad litem to transport her to the abortion provider.  Chutkan Order ¶ 1.

[3] "No risk of flight or danger to the community has even been whispered in this case."  Millett Dissent at 4.

[4] *See* ICE Guidelines, Detention Standard 4.4, Medical Care (if an ICE detainee requests abortion, ICE "shall arrange for transportation at no cost" to the detainee), 307, *available at* https://www.ice.gov/doclib/detention-standards/2011/medical_care_women.pdf.; 28 C.F.R. § 551.23(c) (a federal inmate may decide whether to have an abortion, and if she does, "the Clinical Director shall arrange for an abortion to take place").

"direct [] state interference with a protected activity and state encouragement of an alternative activity." 432 U.S. at 475; *id.* at 476; *see also Harris*, 448 U.S. at 314 (upholding restriction on Medicaid coverage of abortion because it "places no obstacles—absolute or otherwise—in the pregnant woman's path to an abortion") (internal quotation marks and citation omitted). Here, Defendants' actions constitute precisely the type of "direct interference with protected activity" that the Constitution forbids. *Id.* 315. Indeed, as Judge Millett explained, "[t]he government's refusal to release J.D. from custody is not just a substantial obstacle; it is a full-on, unqualified denial of and flat prohibition on J.D.'s right to make her own reproductive choice." Millett Dissent at 4.

*Finally,* Defendants have argued that their actions are permissible because J.D. could voluntarily depart. But, as Judge Millett notes, this argument is deeply flawed, because the government cannot penalize J.D.'s constitutional right to abortion by forcing her to give up her immigration defenses — or her due process rights to assert them — and agree to be voluntarily deported. Millett Dissent at 5-6; *see also Cleveland Board of Education v. LaFleur*, 414 U.S. 632 (1974) (holding that that states could not penalize pregnant public school teachers by forcing them to either take maternity leave when they reached fifth month of pregnancy or face dismissal); *Shapiro v. Thompson*, 394 U.S. 618 (1969) (striking down state statutes that conditioned welfare benefits on a one-year residency

requirement, holding that the statutes violated the right to travel). Indeed, as detailed in the declaration of J.D.'s state-appointed attorney ad litem, J.D. has a substantial claim for special immigrant juvenile status, a status that can eventually lead to becoming a legal permanent resident, based on the abuse she has suffered at the hands of her parents and the danger she faces if she returns home. *See* Cortez Decl. ¶¶ 8-12; Millett Dissent at 6, 9; *see* 8 U.S.C. § 1255(a), (h); 8 U.S.C. § 1101(a)(27)(J); 8 C.F.R. § 204.11. And, in fact, J.D.'s attorney ad litem has already begun the process of attempting to secure this status for her. Cortez Decl. ¶¶ 13-14. In any event, as the panel recognized, J.D. has a constitutional right to abortion. The government cannot shirk its constitutional obligation by forcing J.D. to return to her home country. *Missouri ex rel Gaines v. Canada*, 305 U.S. 337 (1938) (holding that Missouri could not abdicate its constitutional obligation to refrain from discriminating in admissions to a public law school by pointing to schools with open admissions in other states).

## II.  THIS CASE RAISES QUESTIONS OF EXCEPTIONAL IMPORTANCE

This panel's opinion allows the federal government to continue to hold J.D. hostage to prevent her from obtaining an abortion. As Judge Millett noted, the panel's opinion "sacrifices J.D.'s constitutional liberty, autonomy, and personal dignity for no justifiable governmental reason." Millett Dissent at 2. A young woman who has fled her home country alone, after suffering abuse at the hands of

her parents, is now being held captive to prevent her from having an abortion. As discussed *supra*, each week of delay has increased the risks to J.D.'s health, and caused emotional strain. "J.D. retains her basic rights to personhood." *Id*. at 9. But the government's actions, and the panel's order, are robbing her of those rights.

These rights could not be more important in terms of the future course of J.D.'s life or the constitutional interest at stake. As the Court recognized in *Casey*, the Constitution protects "the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." *Casey*, 505 U.S. at 851 (citations and internal quotation marks omitted). Moreover, "[t]hese matters, involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment." *Id.* This prospect that J.D. will be forced to carry her unwanted pregnancy to term against her will — a prospect made much more likely by the panel's order — demands this Court's attention, lest the promise of *Roe* "become[] a solemn mockery." *Cooper v. Aaron*, 358 U.S. 1, 18 (1958) (citations and internal quotation marks omitted).

## CONCLUSION

For the foregoing reasons, this Court should grant rehearing en banc on an emergency basis, vacate the panel's order, and deny Defendants' emergency motion for a stay of the temporary restraining order entered by the district court.

Date: October 22, 2017

Respectfully submitted,

s/Arthur B. Spitzer
Arthur B. Spitzer
Scott Michelman
American Civil Liberties Union Foundation
of the District of Columbia
4301 Connecticut Avenue NW, Suite 434
Washington, D.C. 20008
Tel. 202-457-0800
Fax 202-457-0805
*aspitzer@acludc.org*
*smichelman@acludc.org*

Brigitte Amiri
Meagan Burrows
Jennifer Dalven
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel. (212) 549-2633
Fax (212) 549-2652
*bamiri@aclu.org*
*mburrows@aclu.org*
*jdalven@aclu.org*

Daniel Mach
American Civil Liberties Union
Foundation
915 15th Street NW
Washington, DC 20005
Telephone: (202) 675-2330

*dmach@aclu.org*

Jennifer L. Chou
Mishan R. Wroe
American Civil Liberties Union Foundation
of Northern California, Inc.
39 Drumm Street
San Francisco, CA 94111
Tel. (415) 621-2493
Fax (415) 255-8437
*jchou@aclunc.org*
*mwroe@aclunc.org*

Melissa Goodman
American Civil Liberties Union Foundation
of Southern California
1313 West 8th Street
Los Angeles, California 90017
Tel. (213) 977-9500
Fax (213) 977-5299
*mgoodman@aclusocal.org*

*Attorneys for Plaintiff-Appellee*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Petition complies with the type-volume limitation of Fed. R. App. P. 35 because it has been prepared in proportionally spaced typeface using Microsoft Word in 14 point Times New Roman font and it contains 3, 207 words, that being less than the 3,900 words allowed by Rule 35(b)(2)(A).

Date:  October 22, 2017

/s/ Arthur B. Spitzer
Arthur B. Spitzer

# CERTIFICATE OF SERVICE

I hereby certify that on October 22, 2017, I served the foregoing Emergency Petition for Rehearing En Banc to Vacate the Panel's Order and Deny Defendants-Appellants' Motion for An Emergency Stay upon counsel for the Defendants-Appellants via this Court's CM/ECF system, and also by e-mail addressed to Benjamin Schultz and Catherine Dorsey at Benjamin.Shultz@usdoj.gov and Catherine.Dorsey@usdoj.gov, respectively.

Date: October 22, 2017

/s/ Arthur B. Spitzer
Arthur B. Spitzer

**PETITION APPENDIX: COPY OF PANEL OPINION**
*Garza v. Hargan et. al.*,
No. 17-5236 (D.C. Cir. Oct. 20, 2017)

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**No. 17-5236**  **September Term, 2017**

**1:17-cv-02122-TSC**

**Filed On: October 20, 2017**

Rochelle Garza, as guardian ad litem to
unaccompanied minor J.D., on behalf of
herself and others similarly situated,

        Appellee

    v.

Eric D. Hargan, Acting Secretary, Health and
Human Services, et al.,

        Appellants

     **BEFORE:**   Henderson,* Kavanaugh, and Millett,** Circuit Judges

### O R D E R

Upon consideration of the emergency motion for stay pending appeal, the opposition, the supplement thereto, and the reply; the brief of amici curiae; the administrative stay entered on October 19, 2017; and the oral argument of the parties, it is

**ORDERED** that the administrative stay be dissolved.   It is

**FURTHER ORDERED** that the District Court's temporary restraining order entered on October 18, 2017, be vacated as to paragraphs 1 and 2 of the order and that the case be remanded to the District Court.[1]

The Government argues that, pursuant to standard HHS policy, a sponsor may be secured for a minor unlawful immigrant in HHS custody, including for a minor who is seeking an abortion.   The Government argues that this process – by which a minor is released from HHS custody to a sponsor – does not unduly burden the minor's right under Supreme Court precedent to an abortion.   We agree, so long as the process of securing a sponsor to whom the minor is released occurs expeditiously.   *Cf. Planned Parenthood v. Casey*, 505 U.S. 833, 899 (1992); *Ohio v. Akron Center for Reproductive*

---

[1] As both parties agree, we have jurisdiction over this appeal because the District Court's temporary restraining order was more akin to preliminary injunctive relief and is therefore appealable under 28 U.S.C. § 1292(a)(1).   *See Sampson v. Murray*, 415 U.S. 61, 86 n.58 (1974).

# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

**No. 17-5236**            **September Term, 2017**

*Health*, 497 U.S. 502, 513 (1990).   The District Court is directed to allow HHS until Tuesday, October 31, 2017, at 5:00 p.m. Eastern Time for a sponsor to be secured for J.D. and for J.D. to be released to the sponsor.   If a sponsor is secured and J.D. is released from HHS custody to the sponsor, HHS agrees that J.D. then will be lawfully able, if she chooses, to obtain an abortion on her own pursuant to the relevant state law.   If a sponsor is not secured and J.D. is not released to the sponsor by that time, the District Court may re-enter a temporary restraining order, preliminary injunction, or other appropriate order, and the Government or J.D. may, if they choose, immediately appeal.   We note that the Government has assumed, for purposes of this case, that J.D. – an unlawful immigrant who apparently was detained shortly after unlawfully crossing the border into the United States – possesses a constitutional right to obtain an abortion in the United States.   It is

      **FURTHER ORDERED** that the emergency motion for stay pending appeal be dismissed as moot.

      Pursuant to D.C. Circuit Rule 36, this disposition will not be published.   The Clerk is directed to issue the mandate forthwith to the District Court.

<u>**Per Curiam**</u>

**FOR THE COURT:**
Mark J. Langer, Clerk

BY:    /s/
       Robert J. Cavello
       Deputy Clerk

*Although Circuit Judge Henderson concurs in this order, her reasoning therefor will follow in a separate statement to be filed within five days of the date of this order.

**Circuit Judge Millett would deny the emergency motion for stay.   A statement by Judge Millett, dissenting from the disposition of this case, will issue shortly.

**PETITION APPENDIX: COPY OF MILLETT, J. DISSENT**
*Garza v. Hargan et. al.*,
No. 17-5236 (D.C. Cir. Oct. 20, 2017)

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**No. 17-5236**                         **September Term, 2017**

**1:17-cv-02122-TSC**

**Filed On: October 20, 2017**

Rochelle Garza, as guardian ad litem to
unaccompanied minor J.D., on behalf of
herself and others similarly situated,

        Appellee

    v.

Eric D. Hargan, Acting Secretary, Health and
Human Services, et al.,

        Appellants

## <u>O R D E R</u>

It is **ORDERED**, on the court's own motion, that the Clerk issue the attached statement of Circuit Judge Millett, dissenting from the disposition of this case.

                     **FOR THE COURT:**
                     Mark J. Langer, Clerk

        BY:   /s/
                Amy Yacisin
                Deputy Clerk

MILLET, *Circuit Judge*, dissenting from the disposition of the case.

There are no winners in cases like these.  But there sure are losers.  As of today, J.D. has already been forced by the government to continue an unwanted pregnancy for almost four weeks, and now, as a result of this order, must continue to carry that pregnancy for multiple more weeks.  Forcing her to continue an unwanted pregnancy just in the hopes of finding a sponsor that has not been found in the past six weeks sacrifices J.D.'s constitutional liberty, autonomy, and personal dignity for no justifiable governmental reason.  The flat barrier that the government has interposed to her knowing and informed decision to end the pregnancy defies controlling Supreme Court precedent.

To escape terrible physical abuse in her family, a seventeen-year-old girl known here as J.D. fled her home country and all she has ever known, and all alone undertook a life-imperiling trek for hundreds, perhaps thousands, of miles seeking safety.  Unaccompanied minor migrants are among the most vulnerable persons in the world.  J.D.'s journey exposed her to a tragically high risk of physical abuse, rape, and sexual exploitation at the hands of other migrants, smugglers, and governmental officials in every country whose territory she crossed.[1]

After entering the United States, she was detained by federal immigration officials and, at that time, learned that she is pregnant.  Alone, resourceless, and facing a perilous future, J.D. was appointed a guardian *ad litem* and, in compliance with Texas law, obtained a state court order determining that she was (and is) mature enough to decide for herself whether to continue the pregnancy.  J.D. has also gone through the mandatory counseling required by Texas law and has reconfirmed her decision.  Indeed, the United States does not dispute that J.D. is mature enough to determine her own best interests, nor has it identified any reason that it is not in her best interests to exercise the choice she made, other than a federal agency's own opposition to abortion.  The federal government further represents that it would trust her judgment, if only she had chosen to continue the pregnancy.  But J.D. chose not to continue her pregnancy.

The United States has for weeks now refused to release J.D. into the custody of her guardian *ad litem* to obtain the abortion.  It is undisputed that J.D.'s guardian and attorneys—not the federal government—will transport her and bear the costs of

---

[1] *See generally* UNITED NATIONS HIGH COMMISSIONER FOR REFUGEES, WOMEN ON THE RUN (2015), http://www.unhcr.org/5630f24c6.html; UNICEF, HUMAN TRAFFICKING FOR SEXUAL EXPLOITATION PURPOSES IN GUATEMALA (2016), http://www.cicig.org/uploads/documents/2016/Trata_Ing_978_9929_40_829_6.pdf.

the abortion procedure.  The logistics and paperwork of transferring her to the custody of her guardian *ad litem* will all be handled by a government contractor that is fully willing to do so.  TRO Hr'g Tr. at 4:3–5.  It will not be done directly by any federal governmental official.  And J.D.'s post-procedure medical care will be administered by the contractor, not by government officials themselves.  The Department of Health and Human Services' only task is to *refrain* from barring its contractor from allowing J.D. to receive the medical care.

The government does not dispute—in fact, it has knowingly and deliberately chosen not to challenge—J.D.'s constitutional right to an abortion.  The government instead says that it can have its contractor keep J.D. in what the government calls "close" custody—that is, more restrictive conditions than the contractor imposes on the non-pregnant minors in its care—because of the agency's own supervening judgment that it would be in J.D.'s best interests to carry the pregnancy to term.  If she wants an abortion, the government continues, she must surrender all legal claims to remain in the United States and return to the country of her abuse.

That is wrong and that is unconstitutional.

*Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992), which was reaffirmed just last year in *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2309 (2016), should decide this case.  In *Casey*, the Court held that a "woman's right to terminate her pregnancy before viability" is "a rule of law and a component of liberty we cannot renounce."  505 U.S. at 871.  "[I]t follows that it is a constitutional liberty of the woman to have some freedom to terminate her pregnancy" at the pre-viability stage.  *Id.* at 869.  That liberty is necessary, the Court added, to protect "the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy," and "central to the liberty protected" by the Due Process Clause.  *Id.* at 851.  The Constitution's guarantee of due process thus protects that right for "any person," U.S. CONST. Amend. V, against undue governmental interference.  While the government can have its own interest in promoting the continuation of pregnancy and potential life, prior to viability the government may not place a "substantial obstacle" in the way of a woman's right to decide for herself to discontinue a pregnancy.  *Whole Woman's Health*, 136 S. Ct. at 2309.  Setting up substantial barriers to the woman's choice violates the Constitution.  That is settled, binding Supreme Court precedent.

What is forcing J.D. to carry on this pregnancy is not J.D.'s choice.  It is not Texas law.  It is the federal government's refusal to allow an abortion to go forward.

3

The government's refusal to release J.D. from custody is not just a substantial obstacle; it is a full-on, unqualified denial of and flat prohibition on J.D.'s right to make her own reproductive choice.

What reason does the federal government offer for taking over J.D.'s decision completely and forcing her to continue an unwanted pregnancy that Texas law permits her to terminate? None that remotely qualifies under the Constitution, or that even makes sense.

*First*, the government says it does not want to "facilitate" the abortion. But there is nothing for it to facilitate. As noted, J.D. will be transported to the medical procedure by her guardian *ad litem*. Any expense will be fully born by her guardian and attorneys. All paperwork and medical care will be done by a government contractor. And, as government counsel conceded at oral argument, the court order under review made it unnecessary for the Department of Health and Human Services to decide for itself whether the procedure is in J.D.'s best interests from a federal government perspective.

For those reasons, the government's reliance on cases recognizing the government's ability to prefer that pregnancies be taken to term, to provide information about its views, and to require informed consent through processes that do not unduly burden the woman's choice are of no help. *See, e.g., Harris v. McRae*, 448 U.S. 297 (1980). The government identifies no case that says the government has a right to flatly prohibit an abortion—to override the woman's choice—by virtue of keeping her in custody. And to be clear, it is a custody from which the government would willingly release her to attend doctor appointments if she were to continue her pregnancy. (No risk of flight or danger to the community has even been whispered in this case.) So what the government really claims here is not a right to avoid subsidizing the abortion decision; it claims a right to use *immigration* custody to nullify J.D.'s constitutional right to reproductive autonomy prior to viability.

*Second*, custody does not empower the government to completely override a woman's informed and volitional decision to have an abortion. *See Roe v. Crawford*, 514 F.3d 789 (8th Cir. 2008) (striking as unconstitutional a prohibition on abortion for prisoners with exceptions only for express approval and where necessary for the health of the mother); *Monmouth Cty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326 (3d Cir. 1987) (striking as unconstitutional a policy requiring prisoners to obtain a court ordered release on their own recognizance in order to receive an abortion).

What is more, the government's insistence that it must not even stand back and permit an abortion to go forward for someone in some form of custody is freakishly erratic.  The government admits that, if J.D. were an adult, she would be held in the custody of Immigration and Customs Enforcement (ICE).  That means that the government permits women just a few months older than J.D. who are in ICE custody to obtain an abortion.[2]  Likewise, it facilitates the process so that women in the custody of the Bureau of Prisons can obtain abortions.  28 C.F.R. § 551.23.

So why is J.D.'s case any different?  The government says that, because she is a minor, an official in the Department of Health and Human Services must independently agree that an abortion is in J.D.'s best interests.    And this Administration refuses to so agree.   Without any explanation other than its opposition to abortion.  In so doing, the federal government distrusts the State of Texas, which has conducted a hearing pursuant to state law and authorized J.D. to make the decision herself and to decide whether continuing or terminating the pregnancy is in her own best interest in this respect.  J.D. may make that decision without the consent of her "parent, managing conservator or guardian."  Texas Family Code § 33.003(i-3).  Notwithstanding the States' constitutional primacy in matters of domestic relations, *e.g., Mansell v. Mansell*, 490 U.S. 581, 587 (1989), the United States argues that a federal government official in Washington, D.C. is better positioned and has more authority under the Constitution to prevent an abortion than not only the State, but also *the woman and any parent or husband or father of the child*.  At least, until the woman turns 18.  No judicial bypass exists for that federal official's decision.  That is an astonishing power grab, and it flies in the teeth of decades of Supreme Court precedent preserving and protecting the fundamental right of a woman to make an informed choice whether to continue a pregnancy at this early stage.

*Third*, the government says that J.D. is free to get an abortion as long as she agrees to voluntarily depart the United States.  But the government cannot condition the exercise of a constitutional right by women and girls on their surrender of other legal rights.   The fact that J.D. entered the United States without proper documentation does *not* mean that she has no legal right to stay here to be safe from abuse or persecution.   The Statue of Liberty's promise to those "homeless" "yearning to breathe free" is not a lie.

---

[2] ICE Guidelines, Detention Standard 4.4, Medical Care, available at *https://www.ice.gov/doclib/detention-standards/2011/medical_care_women.pdf*.

5

Federal law, for example, expressly permits juvenile immigrants to seek "special immigrant juvenile status" by showing that they are (i) under 21 years of age, (ii) unmarried, and (iii) dependent juveniles "as a result of abuse, abandonment, or neglect." *Yeoboah v. United States Dep't of Justice*, 345 F.3d 216, 221-222 (3d Cir. 2003); *see* 8 U.S.C. § 1101(a)(27)(J); 8 C.F.R. § 204.11.

Needless to say, conditioning a woman's exercise of her fundamental right to reproductive choice, *see Casey, supra*, on the surrender of other legal rights is at the least a substantial obstacle to the exercise of her constitutional right. And by the way, this is a Hobson's Choice that the federal government demands only of female immigrants.

The majority here accepts none of those arguments by the government. Instead, the court orders J.D. to continue her pregnancy for weeks. Not because she has failed to follow required State processes. She has met every requirement. And not because the majority agrees that the federal government can exercise an un-bypassable veto over the reproductive decision of a minor in its custody. The only reason given is an interest in further pursuing the availability of finding a sponsor for J.D.

That too is forbidden by Supreme Court precedent. The desire to find a sponsor for J.D. to release her from detention is understandable. Children are presumably better off with family members or responsible adults than in the custody of a government contractor. But finding a sponsor and allowing her to terminate the pregnancy are not mutually exclusive. Both can proceed simultaneously. So the desire to pursue that process has nothing to do with and is not a reason for forcing J.D. to continue the pregnancy.

Perhaps the majority wants another adult to be involved in J.D.'s reproductive decision. But J.D. has already made that choice with a guardian *ad litem* by her side, and after all the consent processes demanded by Texas law. To force her to continue the pregnancy just in case someone else comes along with whom J.D. might also consult is to impose layers and layers of consent-style barriers to J.D.'s choice, contrary to settled Supreme Court precedent. *See Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 75 (1976); *Bellotti v. Baird*, 443 U.S. 622, 640–642 (1972) (striking statute requiring minor to obtain the consent of both parents prior to an abortion as unduly burdensome). Even a parent or husband does not have the power that federal government officials now claim to wield. *See id.*

By the way, that distrust of whether J.D. has made an informed-enough-for-the-federal-government decision is a one-way street. It applies only to the decision to end the pregnancy. Had she chosen to continue the pregnancy, that judgment would have been fully respected and supported by the federal government without any further proceedings. If J.D. is mature enough to decide to continue the pregnancy, then she is mature enough to decide not to continue it as well (as Texas law agrees).

Nor is there any factual basis to think that remand will accomplish anything but a forced continuation of the pregnancy. After at least six weeks of trying, no sponsor has been found. Two were identified, but neither passed muster under Health and Human Services' review. (We are not told why, and counsel for the government could not say whether the sponsors' willingness to support J.D.'s abortion decision played a role in those decisions.) And even if a sponsor suddenly appears, that sponsor cannot override J.D.'s choice given that the judicial bypass order makes the consent of a guardian or custodian unnecessary.

This sponsorship process, moreover, is entirely in the control of the Department of Health and Human Services. J.D. cannot control the timing of the decision, nor is there any apparent procedure for challenging a decision or a delayed non-decision. Nor is there any reason to think that a sponsor can be found in short order. If the federal government knew of a sponsor, it would have come forward with that already. The government does not maintain an active list of potential sponsors, and even if one were identified, there is an understandably rigorous vetting process before a child will be handed into the custody of a third party, which includes (i) interviewing prospective sponsors; (ii) sponsors' completion of extensive paperwork; (iii) a thorough background check, fingerprint check, immigration Central Index System check; (iv) home visits where necessary; and (v) conducting an assessment of the child's relationships to non-related prospective sponsors.[3] The federal government could not tell the court how long that process would take, even assuming a responsible sponsor would suddenly be found.

And in this context, timing profoundly matters. Every day that goes by is another day that the federal government forces J.D. to carry an unwanted pregnancy forward. Days also increase the health risks associated with an abortion procedure. *See, e.g.*, *Williams v. Zbaraz*, 442 U.S. 1309, 1314–1315 (1979) (Stevens, J., sitting as Circuit

---

[3] https://www.acf.hhs.gov/orr/about/ucs/sponsors.

Justice) (evidence of an increased risk of "maternal morbidity and mortality" supports a claim of irreparable injury); Linda A. Bartlett, *et al.*, *Risk Factors for Legal Induced Abortion—Related Mortality in the United States*, 103:4 OBSTETRICS & GYNECOLOGY 729 (April 2004) (relative risk from abortion increases 38% each gestational week). In addition, if J.D. is 17 or 18 weeks along by the time this issue is resolved, the doctors at the South Texas clinic nearest to her (assuming it still has availability) will likely no longer be willing to perform the procedure. That will force J.D. to travel hundreds of miles to the next closest medical provider in North Texas. She will be forced to endure this journey twice, once to repeat a counseling session she has already received and again for the procedure itself.

The sponsorship remand, in short, stands as an immovable barrier to J.D.'s exercise of her constitutional right that inflicts irreparable injury without any justification offered for why the government can force her to continue the pregnancy until near the cusp of viability.

Lastly, the amici suggest that J.D. and all others in the United States without documentation are not "persons" entitled to the protections of the Due Process Clause. The United States government, understandably, has deliberately and knowingly decided *not* to raise that argument. It is both forfeited and waived. *See Wood v. Milyard*, 132 S. Ct. 1826, 1832 n.4 (2012); *Kontrick v. Ryan*, 540 U.S. 443, 458 n.13 (2004).

Basic principles of constitutional avoidance and circuit precedent direct us not to decide far-reaching constitutional questions that the parties have deliberately and knowingly chosen not to raise. Indeed, we have held that "[t]he grounds for recognizing the forfeiture of arguments are especially strong where the alleged error is constitutional." *Board of County Comm'rs v. Federal Housing Fin. Agency*, 754 F.3d 1025, 1031 (D.C. Cir. 2014) (holding that the need for constitutional avoidance is particularly acute where a party's forfeiture makes deciding the constitutional question neither "necessary nor even advisable"); *see Camreta v. Greene*, 563 U.S. 692, 705 (2011) (A "longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them.") (internal quotation marks and citations omitted); *Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 346–347 (1936) (Brandeis, J., concurring); *Colm v. Vance*, 567 F.2d 1125, 1132 n.11 (D.C. Cir. 1977) (concluding that constitutional "avoidance is especially preferred where the nature of the constitutional issue poses a difficult decision with significant ramifications").

There are few constitutional questions more far-reaching than the proposition that individuals in the United States without legal documentation do not even qualify

as "persons" under the Constitution.  The Supreme Court has long recognized that immigrants who lack lawful status are protected persons under the Due Process Clause.  *See, e.g.*, *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("[O]nce an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."); *Mathews v. Diaz*, 426 U.S. 67, 77 (1976) (even aliens whose "presence in this country is unlawful, involuntary, or transitory [are] entitled to th[e] constitutional protection" of Fifth and Fourteenth Amendment due process); *Jean v. Nelson*, 472 U.S. 846, 875 (1985) (regardless of immigration status, aliens within the territorial jurisdiction of the United States are "persons" entitled to due process under the Constitution); *cf. Plyler v. Doe*, 457 U.S. 202, 210 (1982) (children of persons here unlawfully are protected "persons" under the Equal Protection Clause of the Fourteenth Amendment).

The implications of amici's argument that J.D. is not a "person" in the eyes of our Constitution is also deeply troubling.  If true, then that would mean she and everyone else here without lawful documentation—including everyone under supervision pending immigration proceedings and all Dreamers—have no constitutional right to bodily integrity in any form (absent criminal conviction). They could be forced to have abortions.  They could, if raped by government officials who hold them in detention, then be forced to carry any pregnancies to term. Even if pregnancy would kill the Mother, the Constitution would turn a blind eye. Detainees would have no right to any medical treatment or protection from abuse by other detainees.  Those with diabetes or suffering heart attacks could be left to die while their governmental custodian watches.

Fortunately, we need not confront that profoundly unsettling argument because no party has raised or briefed it and, as noted, the government has expressly disavowed advancing it.  In an emergency proceeding of this nature, we should be particularly hesitant to decide sweeping questions of constitutional law unnecessarily and without any briefing.

* * * * *

J.D. came to the United States without legal documentation.  That is not disputed.  But the government cannot make a forced pregnancy the sanction for that action.  J.D. retains her basic rights to personhood.  After all, this child fled here all alone in a desperate effort to avoid severe abuse.  And, unfortunately, other women and girls desperate to escape abuse, sexual trafficking, and forced prostitution undoubtedly will also find themselves on our shores and pregnant.  When they,

consistent with legal process, decide to continue their pregnancies, that decision should be supported.  When they decide that their dire circumstances leave them in no position to carry a pregnancy to term, the Constitution forbids the government from directly or effectively prohibiting their exercise of that right in the manner it has done here.

I accordingly dissent.

**PETITION APPENDIX: DECLARATION OF ROBERT CAREY**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ROCHELLE GARZA, as guardian ad litem
to unaccompanied minor J.D., on behalf of
herself and others similarly situated,

          Plaintiff,

  v.

ERIC D. HARGAN, *et al.*,

          Defendants.

)
)
)
)
)
)
)
)
)
)
)
)

No. 17-cv-02122-TSC

## DECLARATION OF ROBERT CAREY

I, Robert Carey, declare as follows:

1.      I previously served as Director of the Office of Refugee Resettlement (ORR) in the Department of Health and Human Services (DHHS) from March, 2015- January, 2017.

2.      As Director of ORR, I oversaw all of ORR's programs, including the Unaccompanied Immigrant Minor ("UC") program.

3.      In my capacity as Director, I became deeply familiar with the ORR policies and procedures for identifying, vetting and approving sponsors for UCs in the legal custody of ORR, including how this process operates in practice. I had overall responsibility for the operations of ORR, including review of policies and procedures.

4.      It is my understanding that Defendants in this case are arguing that their refusal to release J.D. from the shelter to attend her abortion appointment is not an undue burden on her choice because she may be quickly released into the care of a sponsor. It is also my understanding that the Court of Appeals has given Defendants until October 31, 2017, to identify an appropriate sponsor for J.D. and release her to that

sponsor's custody.

5.    As set forth below, based on my knowledge of the sponsor identification and approval

      process, my experience as ORR Director overseeing the UC program, and within it,

      ORR federal field specialists responsible for granting and denying approval to release

      UCs to sponsors, and my understanding of the facts of J.D.'s case, I do not think that

      J.D. can be released within that short time period.

6.    The process for identifying, contacting, vetting and approving a qualified sponsor for

      a UC like J.D. can take weeks or months. This process is also largely outside of the

      control of the individual minor himself or herself.

7.    Indeed, ORR has developed detailed policies and procedures to ensure the safe

      release of UCs to sponsors that have been thoroughly vetted and confirmed to be able

      to provide for the physical and mental well-being of the UCs.

8.    These policies are publicly available on the ORR's website. *See* ORR, Children

      Entering the United States Unaccompanied: Section 2, Safe and Timely Release from

      ORR Care, (hereinafter, "ORR Policies"), *available at*

      https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-

      unaccompanied-section-2. To my knowledge, and as indicated on the ORR website,

      nearly all of the relevant policies referenced herein have not been formally revised

      since I left my position as Director of ORR at the end of January, 2017.

9.    As the policies reflect, and as my experience has taught me, the entire process

      involves many steps, including: "the identification of sponsors; the submission by a

      sponsor of the application for release and supporting documentation; the evaluation of

      the suitability of the sponsor, including verification of the sponsor's identity and

relationship to the child, background checks, and in some cases home studies; and planning for post-release." *See* ORR Policies, Section 2.1.

10.    In certain cases, especially where the UC does not have parents or close relatives in the U.S. available serve as sponsors, each one of these steps can take weeks.

11.    This is true of the very first step – the identification of potential sponsors.  Once a UC arrives in the U.S., is transferred into ORR's care, and placed in a shelter, the minor's assigned case manager at the shelter collects the names of potential sponsors from the minor and, if possible, the minor's parents.  *See* ORR Policies, Section 2. 2. 1.  In the event that the minor does not have contact information for family in the home country, the case manager may work with the embassy of the minor's country of origin to obtain phone numbers and names of close relatives in the home country.

12.    The case manager then contacts the prospective sponsors to confirm whether they would be willing to sponsor the UC.  In some cases, the prospective sponsors are unwilling to serve as a sponsor.  There are multiple of reasons this.  Often, the prospective sponsor is low-income, and may already have children of his/her own, be caring for elderly parents and/or be working multiple jobs to make ends meet.  The prospective sponsor therefore may not feel that they have the capacity to take in and provide for another child.  Also, some prospective sponsors are themselves undocumented or have undocumented family members, and may fear immigration enforcement proceedings and deportation if they come forward to take custody of the minor.

13.    I understand that at oral argument the Court of Appeals asked whether there are lists of people who stand at the ready to be a young person's guardian, in the event that

neither the minor nor his/her parents are able to provide names and/or the prospective sponsors provided are unwilling to be sponsors. No such list exists.

14. I also understand that there is an email in which ORR Director Scott Lloyd stated that he knows "a few good families" that could serve as sponsors for a minor to see her through her pregnancy. To the extent these "good families" are not related to the minor and do not have a prior relationship to the minor and/or the minor's family, releasing a minor into their custody would be contrary to ORR policy, which is designed to keep minors safe from child abuse and from trafficking and exploitation.

15. Indeed, ORR does not allow individuals without a prior relationship to the minor and/or the minor's family to act as a sponsor. In fact, ORR requires sponsors to provide documentary evidence of a prior relationship with the minor and/or the minor's family in order to be approved. *See* ORR Policies, Section 2.2.4.

16. Even once a willing potential sponsor has been identified, the process may still take weeks, particularly for minors—like J.D.—who are *not* being considered for release to a parent or close relative. Below I detail a few parts of the process, and the time they take to complete.

17. First, all potential sponsors are required to provide extensive documentary evidence, ORR Policies, Section 2.2.4, which they may not have at all or which may be located in another country and be difficult to access. For example, potential sponsors must provide documentation of their identity and address as well as evidence verifying the identity of all adults residing with the sponsor and all adult care givers identified in a sponsor care plan. *Id.* This is not always easy for potential sponsors who have limited resources.

18.      As noted above, potential sponsors are also required to provide "proof of sponsor-child relationship."  ORR Policies, Section 2.2.4.  This can be especially challenging.  For family members this means official documents like birth or marriage certificates or court, hospital or school records.  Non-family members must "submit evidence that reliably and sufficiently demonstrates a bona fide social relationship with the child and/or the child's family that existed before the child migrated to the United States."  *Id.*

19.      In many circumstances, obtaining these documents also requires obtaining documents from a UC's or sponsor's home country.  This can be quite difficult.  Indeed, simply communicating with the relevant people in the minor's home country can be very challenging.  Many UC's come from very poor and rural settings.  Their families may not have telephones, much less access to computers or fax machines.

20.      A second step in the process is the home study.  ORR Policies, Section 2.4.2.  Although a home study is not mandatory in all cases, it would be standard practice to require a home study in a case such as J.D.'s, where any prospective sponsor will not be J.D.'s parent or close family relative and J.D. is pregnant.

21.      Because of the backlog of potential sponsors waiting for home visits, it may take weeks to get one.  Even if the process could be expedited, and an individual case could be pushed to the top of the list of those waiting, scheduling and conducting the home study will still take time. ORR contracts with grantee organizations to conduct the home studies. Because many prospective sponsors are working multiple jobs, scheduling the home visit can be time consuming.  The ORR grantee organizations that conduct the home studies have to coordinate a time to arrive at the home to

conduct the study with the prospective sponsor.  Finding a window of time during which the sponsor will be home and available for the study is often difficult, particularly where the prospective sponsor is working multiple jobs.

22.     Even after the home study has been scheduled and completed, the home study grantee must prepare a written report documenting their findings, and has 10 business days from the receipt of the referral to submit this report.  ORR Policies, Section 2.4.2. After receiving the report, the case manager must evaluate the case.  In the event the home study reveals the potential sponsor to be unsuitable, the process may have to start from square one, with the identification of a new potential sponsor.

23.     Even where the case manager recommends approval of the sponsor based on the documentation submitted and the results of any home study that was completed, this is not the end of the process—the recommendation must still go through multiple levels of internal and external review, particularly in cases like J.D.'s.

24.     First, the case manager must submit this recommendation to his/her supervisor at the shelter, who in turn will submit the recommendation to a reunification specialist at the shelter.  ORR Policies, Section 2.7.  In the event the case manager's superiors disagree with or have questions about the recommendation, this internal review could take time.  Even if there is internal agreement within the shelter, the recommendation for approval must still be submitted to an external ORR contractor for a quality control check.  This contractor reviews the recommendation and information underlying it to ensure that the recommendation is supported by sufficient information and that the shelter staff did not make any serious errors. In the event the quality control contractor finds that requisite information is missing or an error has

been made, the application package may be transferred back to the shelter staff with instructions for additional information gathering.

25.     Once the application and recommendation has passed through all the internal levels of review and external quality control check, it is then presented to the ORR federal field specialist (FFS) who oversees the shelter for review and approval.  The FFS must review all of the information in the package, and may also be required to wait for the results of the requisite background checks on the sponsor, before issuing a final decision approving or denying the application.  In some cases, the FFS may send a case back to the shelter, instructing the case manager to obtain and submit additional information before the FFS makes a release decision. ORR Policies, Section 2.7.

26.     For a minor like J.D., who is pregnant and whose sponsor would not be a parent, this internal and external review and final approval process could take upwards of 6 weeks to complete.

27.     In the event the FFS approves the application, the shelter must then coordinate the release of the UC to the approved sponsor. The sponsor is generally responsible for raising the money for and booking any airfare or transit ticket required for the UC to travel from the shelter to the sponsor's home. Because many sponsors are low-income, raising the money to purchase an airline ticket can be a time-consuming process. Accordingly, even once the sponsor has been approved, just the release itself, which may seem simple, can take several days to a week to complete.

28.     In sum, based on my experience and understanding of ORR policies, in the case of a minor like J.D. – who is pregnant and who does not have a parent or close family

relative in the U.S. to serve as a viable sponsor – the process of identifying, properly vetting and approving of a sponsor, so as to enable the safe release of the minor into the sponsor's custody, is likely to take months to complete. The ORR policies outlined herein are in place for good reason – they are vitally important to ensuring the safety of all unaccompanied immigrant minors and preventing exploitation and human trafficking. Accordingly, it is my opinion that weakening any of these procedures to expedite the release of a pregnant minor to a sponsor who is neither the minor's parent, legal guardian or close family relative would risk setting a dangerous precedent.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in New York, NY, on October 22, 2017.

Robert Carey